The following opinion was delivered in the case of Gould v.The Town of Sterling:
The first objection made to the recovery in this case is, that the act of 1851 authorizing the town of Sterling to borrow money is in conflict with the Constitution, upon the principles established in Barto v. Himrod (4 Seld., 483). This objection is sufficiently answered by the case of The Bank of Rome v.The Village of Rome (18 N.Y., 38). Previous to the act of 1851, the town of Sterling had no power to borrow money or subscribe for stock, even if every inhabitant of the town were desirous of doing so. It was under a disability which it required legislation to remove. The effect of the statute was simply to remove this disability. Whether it was expedient for the town to exercise the power when obtained, was another question. It belonged to the legislature to confer the power, and this it did, without requiring the consent of the town. It belonged to the town to act under the power, and this was left to the town, without any interference on the part of the legislature, except to prescribe by what majority and in what mode it should act. There was here no submission of any legislative question to the town. All that it was essential for the legislature to do was done finally and absolutely. It was not submitted to the people of the town in any form, whether the act, or any portion of it, should take effect. All that was submitted to them was the prudential question, whether it was expedient to avail themselves of the power which the statute conferred. It was upon this distinction solely, that I based my assent to the judgment in the case of The Bank ofRome v. The Village of Rome (18 N.Y., 38), and not at all upon the idea that the question was submitted to the people of a village, merely instead of the whole state.
Our next inquiry is, whether the authority conferred by the statute has been properly exercised. The first section of the act of 1851 authorizes the then supervisor of the town, together with Robert Hume and William Wyman, who are appointed commissioners for the purpose of carrying the act *Page 457 
into effect, to borrow upon the credit of the town a sum not exceeding $25,000, at a rate of interest not exceeding seven per cent, and to execute bonds "under their official signatures" therefor, upon which the interest should be "made payable on the first day of March in each year, and for three successive years after the first day of March, 1852."
Section four made it the duty of the board of supervisors of the county, in each of the years, 1851 and three following years, to levy and collect from the taxable inhabitants and property of the town, a sum equal to the interest upon the bonds; and in each of the years succeeding the said three years, to levy and collect in like manner, a sum over and above the interest, equal to the principal which would fall due, on or before the 1st of March thereafter. The bonds or obligations in question were not in fact issued until August, 1853, and were signed not by John M. McFadden, the supervisor of the town of Sterling for the year 1851, and by Robert Hume and William Wyman the commissioners named in the act, but by William Wasson, supervisor for the year 1853, and by Robert Hume and Isaac Turner, the commissioners elected for that year under section 10 of the act.
It is insisted by the defendant's counsel that the authority to act was given specifically to the supervisor for the year 1851, and to the commissioners named in the act, and that no other persons could exercise it: also that the persons whose assent was to be obtained, were those appearing upon the last assessment roll previous to the passing of the act; and that the power to levy and collect the sums necessary to pay the principal and interest of the bonds was confined to specific years, and could not be exercised at any other time.
There is no doubt that a statutory power of this kind must be strictly pursued; and were there no other authority for the issuing of the bonds in question, than the act of 1851, they would, in my opinion, be clearly void. An additional act, however, was passed in 1853 (Sess. Laws of 1853, ch. 605), by which it was provided, that it should be "lawful for the supervisor and railroad commissioners of the town of Sterling, *Page 458 
to execute the bonds authorized to be issued" by the act of 1851, "with provisions and stipulations therein, for the payment of the interest to accrue upon the said bonds, on the 1st day of January and July in each year instead of the 1st day of March," as was provided by the previous act.
This last act was very imperfectly framed. It substitutes, with sufficient clearness, the supervisor and commissioners for the year 1853, for those of 1851; but it leaves all the other specific provisions of sections 1 and 4 of the act of 1851 without modification in terms. Still, by a liberal construction, in view of the obvious design of the act, it may with propriety be held, that the effect of the act of 1853, was to modify the entire act of 1851, so that its provisions should have the same application to the bonds authorized by the act of 1853, as to those authorized by the previous act; in other words that the year 1853, was to be substituted in all respects for the year 1851, in the original act, and the other provisions to be modified in accordance with this change. This construction removes the principal if not all the difficulties growing out of the departures from the strict letter of the act of 1851. It is said that the bonds purport upon their face to be issued by virtue of the act of 1851 alone; and hence that they cannot be sustained by a resort to the provisions of the subsequent act. This, however, is an erroneous conclusion. There was no necessity that the bonds should, in terms, refer to either act. The important question is, whether the authority existed; not whether it is properly stated in the bonds.
But there are other objections to the validity of these bonds of a more serious nature. The statute authorized the officers of the town to borrow the sum of $25,000, and pay it over to the president and directors of the railroad company to be expended by them "in grading and constructing" a railroad, c. Instead of borrowing the money, the supervisor and commissioners delivered over the bonds to the company in payment for stock, for which they were authorized by the act to subscribe, and the company sold them at a discount. The question is, whether this was within the authority conferred by the *Page 459 
act. It is clearly not within its language. No money was borrowed, and nothing else was authorized by the terms of the act. If however what was done, was the same in effect, as if the money had been borrowed, and paid over to the railroad company, the difference in form would not be material. But it is plain that neither in respect to the railroad company nor the town was its effect the same. If the statute had been pursued, the company would have had a sum equal to the par value of the bonds, to expend upon their road. As it was, they were compelled to sell the bonds at a discount, in order to realize the money.
If they could sell at a discount at all, they could of course sell at any sacrifice however great. The bonds of the town of Sterling for $25,000, might have been sold for $10,000. Can it be supposed, that if such a power had been specifically asked of the legislature, the request would have been granted? Would the town have been permitted to raise by taxation upon its inhabitants $25,000, for the sake of furnishing the railroad company with $10,000, to be expended upon its works? I think not; and yet this is, in effect, the power which it is claimed was conferred by the act authorizing the town to borrow. The rate of discount, whether more or less, can make no difference with the principle.
Had the town itself made the sale, and paid over the avails to the railroad company, it seems to me entirely clear, that the transaction would have been illegal. It is usual for the legislature when conferring upon a municipal or other corporate body the power to raise money upon the faith and credit of the corporation, to guard against such a sacrifice. An example of this may be seen by referring to the act amending the charter of the city of Rochester, passed July 3, 1851. By section 12 of that act the common council were authorized to create a public stock not exceeding $30,000, to be applied to the erection of a city hall; and for that purpose to issue bonds or certificates in the usual form. They were also authorized to sell and dispose of such bonds or certificates "upon such terms as they should (shall) deem most advantageous to *Page 460 
the city, but not for less than par." By section 285 of the amendatory act, power was conferred upon the common council to borrow upon the faith and credit of the city a sum not exceeding $300,000, at a rate of interest not exceeding seven per cent, and to issue bonds therefor; and by section 286, they were authorized to sell and dispose of such bonds, upon such terms as they might deem most advantageous, and to invest the proceeds in the Genesee Valley Railroad Company; but they were expressly prohibited from selling them for less than par.
The reason why such a prohibition was not inserted in the act under consideration can be readily seen. By each of the sections of the act amending the charter of the city of Rochester, to which I have referred, the common council were expressly authorized to sell the bonds; and hence the necessity of the restriction. In the present case, the only authority given by the act is to borrow upon the bonds of the town. No express power to sell the bonds is given, and no such power can, I think, be implied. To borrow money and give a bond or obligation for it, and to sell a bond or obligation for money, are by no means identical transactions. In the one case the money and the bond would, of course, be equal in amount: in the other, they might or might not be equal. Hence, a mere authority to a corporation to borrow money upon its bonds is equivalent, ex vi termini, to an authority to dispose of the bonds at par; and no further restriction is necessary.
But, it is true, the town did not itself sell the bonds, nor make any sacrifice upon them. It transferred them to the railroad company at par, in payment for stock for which it was authorized to subscribe. This, however, does not strengthen the plaintiff's case. It was as much a departure from the terms of the statute as if the town had itself sold the bonds at a discount, and was equally inconsistent with the object and intent of the act, which was, that the railroad company should receive a sum equal to the amount of the debt incurred by the town, to expend upon the road, in the completion of which the town was supposed to have an interest. There is, therefore, in *Page 461 
this case, not only a literal, but a substantial, difference between the course pursued and that pointed out by the statute. It follows that the bonds were illegally issued, and were, consequently, void in the hands of the railroad company; and, as the referee has expressly found that the plaintiff became the purchaser, with full knowledge that the bonds had not been issued for money borrowed, but in payment for the stock of the company, he is in no better situation than the railroad company itself.
There is another objection, which is equally fatal to the validity of the bonds. Section 1 of the act of 1851, after conferring upon the supervisor and railroad commissioners power to issue the bonds, concludes with a proviso to the effect that these officers should have no power to do any of the acts authorized by the statute until "the written assent of two-thirds of the resident persons taxed" in the town, as appearing upon the last assessment-roll, should have been obtained and filed in the clerk's office of Cayuga county.
Each of the bonds upon which the action was brought stated upon its face that the requisite assent had been obtained and filed, and to each was attached a certificate in the following words: "Cayuga County Clerk's Office, ss: I, Edwin B. Morgan, clerk of the county of Cayuga, hereby certify that a paper, purporting to be the written assent of two-thirds of the resident taxpayers of the town of Sterling, with the affidavit required by section 1 of the act referred to by its title in the foregoing bond, has been filed in this office."
The statute did not authorize the giving of any such certificate, nor did it provide for the filing of any affidavit, or prescribe in any manner the evidence by which the requisite assent should be established. The paper referred to in the certificate was also produced from the files of the clerk's office, with a number of names attached. This paper, together with the certificate, was read in evidence, under objection by the defendant's counsel. No evidence was given, or offered, of the genuineness of the signatures; nor that the subscribers were resident taxpayers of the town of Sterling; nor that the persons whose *Page 462 
names were appended, if taxpayers, would constitute two-thirds of the whole number. The defendant's counsel moved for a nonsuit for want of such evidence; and the motion was denied.
It was not contended upon the argument, if the obtaining of the written assent of two-thirds of the taxpayers, pursuant to the statute, is to be regarded as an indispensable prerequisite to the exercise of the power to issue the bonds, that the evidence was sufficient, under the ordinary rules of evidence, to establish the fact. But it was claimed, on the part of the plaintiff:
1. That the provision in regard to the consent of the taxpayers was not intended as a condition precedent, but merely as directory to the supervisor and commissioners; and that, whenever those officers were satisfied that such consent had been given, they had power to act.
2. That the town was estopped by the acts of its agents in executing bonds asserting upon their face that the requisite assent had been obtained and filed, and negotiating these bonds with the certificate of the county clerk annexed; especially after having acquiesced for a considerable time in such acts.
3. That the bonds are negotiable instruments, and that the plaintiff is a bona fide holder without notice of the defect.
The first of these positions is obviously untenable. It is quite impossible to construe the proviso in the statute as embracing a mere direction to the officers upon whom the authority is conferred. It was plainly intended to make the obtaining of the assent of the taxpayers a condition precedent to the exercise of the power. Its words are, "Provided always that the said supervisor and commissioners shall have no power to do any of the acts authorized by this act until," c. This admits of but one interpretation. It would be impossible to create a condition by language more explicit. The want of proof, therefore, that this condition had been complied with, must be fatal to the recovery, unless the plaintiff is protected as abona fide purchaser or can maintain his position that the town is estopped. *Page 463 
The estoppel contended for is supposed to result from that rule of the law of principal and agent in accordance with which it is held that, where a power is conferred, if the agent does an act which is apparently within the terms of the power, the principal is bound by the representation of the agent as to the existence of any extrinsic facts essential to the proper exercise of the power, where such facts from their nature rest peculiarly within the knowledge of the agent. This is the doctrine asserted in the case of Farmers' and Mechanics' Bank v. Butchers' and Drovers'Bank (16 N.Y., 125). No representation of the agent as to the fact of his agency, or as to the extent of his power, is of any force to charge the principal. But, it being shown by other evidence that the agency existed, and that the act done was within the general scope of the power, the principal is bound by the representation of the agent as to any essential facts known to the agent, but which the party dealing with him had no certain means of ascertaining.
The reason upon which this rule is founded is that given by Lord HOLT, in Hern v. Nichols (1 Salk., 289), viz., that, where one of two innocent parties must suffer through the misconduct of another, it is reasonable that he who has employed the delinquent party, and thus held him out to the world as worthy of confidence, should be the loser. This reason can, of course, only apply to a case where the principal has himself employed the agent, and voluntarily conferred upon him power to do the act. This clearly is not such a case. The agents here were designated, not by the town, but by the legislature; and no power whatever was conferred by the town, unless the assent of the taxpayers was obtained. Any representation, therefore, by the supervisor and commissioners in respect to such assent would be a representation as to the very existence of their power. Such representations, as we have seen, are never binding upon the principal. It is obvious, therefore, that the doctrine of the case of The Farmers' and Mechanics' Bank v. The Butchers' andDrovers' Bank has no application to the present case. *Page 464 
It is also inapplicable for another reason. Knowledge of the facts in regard to the assent of the taxpayers was in no manner peculiar to the supervisor and commissioners, but was equally accessible to the parties receiving the bonds. The statute, of which they were bound, of course, to take notice, apprised them that the bonds could not be legally issued until the requisite assent was obtained, and also that the assent, when obtained, would be placed upon the files of the county. The case is not, therefore, at all like that of the Butchers' and Drovers' Bank, where the extrinsic fact related to the state of the accounts of the bank with one of its customers, which could only be known to the teller and other officers of the bank. Here the parties who received the bonds had the means of ascertaining, and were bound to inquire as to the existence of, the facts upon which, as they knew, the validity of the bonds depended.
The negotiability of the bonds in no manner aids the plaintiff. It is true they are negotiable, and have in this respect, most if not all the attributes of commercial paper. But one who takes a negotiable promissory note or bill of exchange purporting to be made by an agent, is bound to inquire as to the power of the agent. Where the agent is appointed and the power conferred but the right to exercise the power has been made to depend upon the existence of facts, of which the agent may naturally be supposed to be in an especial manner cognizant, the bona fide holder is protected; because he presumed to have taken the paper, upon the faith of the representation of the agent as to those facts. The mere act of executing the note or bill, amounts of itself in such a case, to a representation by the agent to every person who may take the paper, that the requisite facts exist. But the holder has no such protection, in regard to the existence of the power itself. In that respect the subsequent bona fide holder is in no better situation than the payee, except in so far as the latter would appear of necessity to have had cognizance of facts, which the other cannot be presumed to have known. *Page 465 
There is an obvious distinction between this case and that of the State of Illinois v. Delafield (8 Paige, 527). There the State was the party to be bound, and the State had by law appointed certain officers its agents, and conferred upon them power to execute and negotiate its bonds. The difficulty consisted in the irregular manner in which the power was executed, not in the creation of the power itself. The distinction is as plain as that between conditions precedent and subsequent in general.
It follows from these principles, that until it was shown, that the written assent of the required number of taxpayers had been obtained pursuant to the act, there could be no recovery upon the bonds. The judgment of the Supreme Court must be reversed, and there must be a new trial, with costs to abide the event.
DAVIES, J., did not hear the argument in either case; all the other judges concurring,
Judgments reversed, and new trials ordered.