1840.

The State of
Illinois
v.
Delafield.

STATE OF ILLINOIS *vs.* DELAFIELD.

Where the legislature of a state authorized its officers to borrow monies for the use of the state, and to sell its bonds or public stocks for that purpose, but for not less than their par value ; *Held,* that a sale of bonds or stocks which were to draw interest from the time of the sale, but which were to be paid for in future instalments only, and without interest, was a sale of such bonds or stocks for less than their par value ; although the difference in exchange, between the state and the place of such sale, was equal to the interest on the instalments, in favor of the latter place.

An agent for a state, who is authorized to borrow money upon a sale of its stocks, cannot, without an express authority from the state, sell such stocks on a credit.

As a general rule, an agent for a sale must sell for cash, unless he has an express authority to sell upon credit. But an authority to sell on credit may be implied, where from the general usages of the trade in which the agent is employed it is the custom to sell on credit.

Where the agents of a state have made an unauthorized contract for the sale of its stocks on credit, or below their par value, to a purchaser who is chargeable with notice of the want of authority on the part of such agents to make such sale, the state may repudiate the contract ; and will be entitled to an injunction restraining the purchaser from disposing of the stocks, or of the proceeds thereof, where such stocks are negotiable, so that the state would be bound to pay the same to a bona fide holder to whom they had been transferred without notice of the illegality in the sale thereof by its agents.

The public stocks of a state are not an article of merchandize which its agents are authorized to sell on credit, without an express authority, even where by the usages of trade it is the custom to sell such stocks on a credit when they are the private property of individuals.

THIS was an application for an injunction, to restrain the October 6. defendant from selling, hypothecating, or parting with certain bonds or certificates of public stocks of the state of Illinois, or the proceeds thereof ; and for the appointment of a receiver of the bonds or certificates which remained in the hands of the defendant, and of the proceeds or avails of such of the stock as had been sold. The bonds for $300,000 of the stock were signed by the governor and auditor of the state, and countersigned by the treasurer ; as directed by the act of the 9th January, 1836, for the construction of the Illinois and Michigan canal. And the bonds for $283,000, the residue of the stock, were signed by the

1840.

The State of
Illinois
v.
Delafield.

fund commissioners, and duly countersigned by the auditor; as authorized by the act of February, 1837, to establish and maintain a general system of internal improvements. The interest upon the first bonds, at the rate of six per cent per annum, was payable semi-annually at New-York or Philadelphia, at the option of the holders; the principal reimbursable at either of those places, at the pleasure of the state, after the year 1860. And the other bonds were payable in the same manner, except that the principal was not reimbursable until after the first of January, 1870. The first parcel were received by the defendant, under an agreement made by the agents of the governor, who was authorized by law to appoint agents to borrow money upon such stocks for the making of the canal; under an express prohibition, however, contained in the statute, that the stock *should not be sold for less than its par value.* And the last parcel was received by the defendant under an agreement made with the fund commissioners, who were also authorized to make loans of money for the internal improvement of the state, and to issue such bonds for the money loaned thereon; but under a similar restriction, that the stock or bonds *should not in any event be sold for less than their par value.* The bonds in both cases were sold to the defendant on a credit; the money to be paid to the state in periodical payments, without interest, although the bonds were to be delivered to the defendant in advance, and were to bear interest immediately. The defendant had paid to the agents of the state about $170,000 towards the bonds, but made default in meeting the other instalments as they became due; leaving more than $400,000 of the stipulated price of the bonds delivered still due and unpaid, according to the contracts.

*W. Kent & D. Webster,* for the complainant. The contracts made with Delafield are illegal and void; and this upon two grounds: 1. The stock was sold below its par value, in direct violation of the statutes under which it was authorized to be issued; 2. The agents of the state were

not authorized to sell the bonds or certificates of stock upon credit. The agents appointed by the governor, who made the first contract, and the fund commissioners who made the second contract, were not judicial officers, but mere agents of the state ; and the statutes under which alone they could act were severally special powers of attorney, constituting such agents special agents of the state ; and, as such, they were to be governed by their instructions and the usages of trade ; and there is no distinction between the agent of a government and the agent of an individual. A person dealing with an agent with limited powers is bound to examine the authority of that agent. (*Chitty on Cont.* 58. *Schimmelpennick* v. *Bayard,* 1 *Pet. S. C. Rep.* 264. 15 *East,* 43.) The agents of the state had no authority except what was derived from the statutes of the state. The principal is not bound by the acts of the agent beyond his authority. (*Story on Agency,* 160, § 170. *Beals* v. *Allen,* 18 *John. R.* 363.) The sale was below par. The interest upon the bonds delivered under the first contract was to commence running from their delivery ; and upon those delivered under the second contract, was to commence running from the date of the contract ; while the payments for the bonds were to be made at stated times without interest, —the first payment to be fifteen days, and the last thirteen months, after the delivery of the bonds to Delafield. The time of the payments thus to be made being, upon the aggregate amount, about three and a half months upon the first contract, and about ten months upon the second contract, after the delivery of the bonds. The difference in exchange between New-York and Illinois cannot be taken into consideration, or set off against the loss of interest. The money was to be raised, and the interest paid, and principal to be reimbursed, at the same place. The rate of exchange between New-York and Illinois had nothing to do with the contracts. The standard value of gold is about seven and a quarter per cent greater in this country than in England. And therefore the nominal rate of exchange between the two countries is greater by that amount than

1840.

The State of
Illinois
v.
Delafield.

the real rate. But the agents of the state would not have been authorized to sell the bonds in London at a discount ; though they might have sold them at the real par value according to the standard of gold by our laws. The idea of a sale at par excludes any allowance for the difference for exchange merely. A sale at par is a sale dollar for dollar. The state wished to borrow money, and it was only in furtherance of such wish that the legislature authorized a sale of the bonds ; and the legislature intended that the bonds should only be sold by receiving a dollar in money for every dollar to become due and payable upon the bonds. Any part of a contract being contrary to statute, renders the whole contract void. (*Chit. on Contr.* 228, § 2. 1 *Chit. Pl.* 323, *and cases cited. Crawford* v. *Morrell*, 8 *John. R.* 253.)

The agents had no authority to sell the bonds upon credit. An agent, whether general or special, has no power to sell on credit, unless expressly authorized so to do, except in cases where the property which he is employed to sell is of that description which is usually sold on credit. (*Smith's Merc. Law*, 2d *Lond. ed.* 87.) It is not shewn that it was the usage of trade to sell stock on credit ; and on the contrary, such was not the usage. (*Wiltshire* v. *Sims*, 1 *Camp.* 258. *Story on Agency*, 74, § 78.) The statutes of the state did not authorize the commissioners or agents to sell on credit ; and such a sale was against the whole spirit of the laws of the state.

There has been no ratification of the contracts. A contract can be ratified only by one who had power originally to authorize the making of the contract. The state by her legislative act expressly prohibited the sale of bonds for less than their par value ; and by the whole tenor and spirit of her acts, as well as by the custom of trade, which, being established, is the law, prohibited the sale on credit. Hence nothing short of an act of her legislature can validate a contract made in contravention of her statutes and the law. The acts which are alleged as amounting to a ratification, are mostly acts of the very agents who made

the contracts originally. The silence of the state, through her legislature, would be no ratification. The only way for her to repudiate the contracts was to come, as she has come, into a court of equity for relief against the unauthorized and illegal acts of her agents. The contracts being unauthorized and illegal, any and every secondary contract, or subsequent act, is also unauthorized and illegal.

The state has no remedy except against Delafield. The bonds are instruments transferable by delivery, and the state is bound in honor to pay them to a bona fide holder. A subsequent purchaser in good faith would not be required to know that their original transfer had been unauthorized or illegal.

*E. S. Van Winkle & G. Griffin*, for the defendant. The bill does not make out a case which entitles the complainant to relief in equity. The complainant has an adequate remedy at law for the injury complained of in the bill. (*Mitf. Plead.* 109. 8 *Com. Dig.* 61. 4 *John. Ch.* 559. 2 *Ibid.* 522. *Anon.* 12 *Mod.* 514. 1 *Sch. & Lef. Rep.* 25.) The defendant acquired a valid title to the bonds in question, by virtue of the contracts with the fund commissioners of the respondent, the subsequent ratification of those contracts by the respondent, and the payment to, and acceptance by the respondent, of a portion of the consideration agreed to be given for the bonds, in pursuance of the contracts for their sale. The defendant, therefore, simply held the relation of debtor to the respondent, for whatever balance might be due upon those contracts. The remedy of the complainant in such case is complete by suit at law to recover such balance. The fact that the defendant is not of sufficient responsibility to meet any recovery that might be had at law, forms no ground for the interposition of a court of equity. But if, as is claimed by the bill, the contracts were void, so that the defendant acquired no title to the bonds, still the remedy of the respondent is complete at law. The value of the bonds, or the bonds themselves, at the election of the complainant, can be recovered of the

1840.

The State of
Illinois
v.
Delafield.

defendant at law. The payment of the bonds can be justly and legally resisted by the complainant, whether they are in the hands of the defendant or third persons. No case of fraud is alleged or pretended, as the ground of a concurrent equitable jurisdiction. (5 *Ves.* 618. 4 *John. Ch.* 352. 2 *Dal.* 402. 3 *Swans.* 491, *note.* *Mitf. Pl.* 136, 141.)

The bill is not signed by the complainant, nor by any person authorized to bind her, nor filed by her authority. Any decree, therefore, which might be given upon this bill, would not be obligatory upon her, and would therefore be no protection to the defendant. (13 *Brown. Ch.* 321. 1 *Ves. jun.* 275. 1 *Wash. C. C.* 274. 6 *John. Ch.* 49.)

If the foregoing positions should be held untenable, then we submit that the whole equity of the bill is disproved by the affidavit of the defendant. The contracts are shewn to be valid. The fund commissioners were the general agents of the complainant for making sale of the bonds; they claimed to have authority to sell on the terms they did. Whether they had such authority or not, depended upon the construction of the statutes of the state of Illinois. After the contracts were made they were approved by the governor and auditor, and the bonds in question were issued in fulfilment of the contracts on the part of the respondent. The defendant was fully justified in giving credence to the construction which those high functionaries put upon their own statutes. The state of Illinois has not only, by her legislative action, expressly refused to repudiate the contracts, but has ratified and confirmed them; by the acts of her governor, her fund commissioners, her auditor, by receiving payments upon the contract, and applying them to her own use, by the payment of the interest on the bonds and by her legislative action. And she cannot now, in a court of equity, repudiate them if she would. (*Paley on Agency,* 143, 172. *Smith's Merc. Law,* 60. *Routh* v. *Thompson,* 13 *East,* 274. *Prince* v. *Clark,* 1 *Barn. & Cress. Rep.* 187. *Smith* v. *Hodson,* 4 *T. R.* 211. *Clarke* v. *Perrier, Freem. Ch. Rep.* 48. *Kemp* v. *Pryor,* 7 *Ves. Rep.*

237.   *Ward* v. *Evans*, 2 *Salk. Rep.* 442.)   Her only remedy, therefore, is upon the contracts; and she can no more resort to a court of equity to enforce payment upon them than she could to collect any other ordinary debt.

The complainant violated the terms upon which the contracts were made, and thereby reduced the value of the bonds in the hands of the defendant greatly below the price which he had agreed to pay for them.   Under such circumstances, the complainant has no equitable claim to any remedy or relief beyond what she can obtain at law.

The defendant had disposed of all the bonds prior to the filing of the bill, and had none of them in his possession or under his control.   No injunction, therefore, restraining him from diposing of or parting with the bonds, can be necessary or available.   The complainant then is simply a creditor at large of the defendant, for whatever balance may be legally due from him for those bonds.   Such creditor is not entitled to a receiver, or an injunction to restrain his debtor from making any disposition of his property he may choose.   (*Higgins* v. *Armstrong*, 2 *John. Ch. R.* 144.)

THE CHANCELLOR.   There are no controverted facts in this case which have any bearing upon the questions to be decided on this application.   The state bonds, or certificates of public stocks, which are the basis of this controversy, purport to have been issued in accordance with the provisions of the statutes of Illinois, authorizing the governor in the one case, and the fund commissioners in the other, to issue such securities.   If these securities, therefore, pass into the hands of *bona fide* holders, who have no notice of any irregularity, or want of authority on the part of the officers or agents of the state who put them in circulation, the complainant is both legally and equitably bound to pay them to such holders.   The state cannot indeed be sued by any private individual or corporation.   It therefore may be impossible to coerce a payment by any legal process, unless the stock should come into the posses-

sion of a sovereign state ; or should get into the hands of a debtor of the state of Illinois, so as to be a proper subject of set-off in a suit against him by the complainant for the debt. But the honor or faith of the state is nevertheless as much pledged for the redemption of these securities, which she has permitted her agents to put in circulation, as that of an individual would be under similar circumstances. Whether the complainant is or is not liable to a suit by the bona fide holders, into whose hands these bonds or certificates may happen to come in the usual course of business, her exemption from legal process cannot then be properly urged as an objection to her claim to relief in this court. If, therefore, the contracts with the defendant were unauthorized, and have not been subsequently ratified by the state, or by her agents duly empowered by her to ratify such contracts, the complainant is entitled to the relief asked for here. She cannot be compelled to sue in a court of law, upon invalid agreements of her agents, in which suit she could only recover the amount stipulated in their contracts ;. if she should recover any thing thereon.

The counsel for the State of Illinois insist that the contracts made with the defendant were illigal and unauthorized on two grounds : *First*, That the stock was sold below its par value, in direct violation of the statute under which the bonds were authorized to be issued. *Secondly*, That the agents of the state were not authorized to sell the bonds or certificates of stock upon credit. The contract of the 23d of April, 1839, was ofor a sale of the bonds to the amount of $300,000, and the interest was to commence running on the bonds *from the time of their delivery to the defendant*, which was to be on or before the 10th of June. The first payment thereon was to be made by a deposit of $50,000 in one of the free banks of New-York, fifteen days after the delivery of the bonds. It was not, however to be drawn for immediately, but by drafts at not less than ten days sight. And the residue was to be paid in instalments of $50,000 each, on the first day of August, September, October, November, and January thereafter, without

interest ; in bank notes of some bank or banking association in the city of New-York.

If will be seen, that by this arrangement the state was subjected to a loss of interest, upon an average, of about 108 days upon these instalments ; even if the stock was not delivered until the 10th of June, the latest time allowed by the contract for its delivery. In addition to this, the state was to run the risk of a suspension of specie payments by all or any of the banks or banking associations of the city of New-York. For the defendant, by the terms of the agreement, had a right to make the five last payments in a depreciated currency, if any of those institutions should have suspended specie payments at the time when any of those instalments became due and payable.

The contract made by the defendant with the fund commissioners, on the 7th of May, 1839, for the sale of $283,000 of internal improvement bonds, was still more unfavorable to the state. The interest on those bonds was to commence running from the date of the contract. But the amount of the loan to the state was payable in instalments of $50,000, on the first days of December, February, March, April, and May then next, without interest ; and the last instalment of $33,000 was payable on the first of June, 1840. By computation it will be found that the credit thus given was equal to about ten months upon the aggregate amount, making a loss of interest to the state of more than $14,000, at the rate of interest which she was paying on the bonds in the mean time. The contract does not specify where the deposites are to be made, to the credit of the Bank of Shawneetown, for the use of the state. And therefore, by its terms, would probably have authorized the deposite of the money in New-York, or at the Bank of Shawneetown, in the state of Illinois ; at the election of the defendant. I presume, however, it was intended by the parties that the money should be deposited in some bank or banking association in the city of New-York ; and that this was a mere slip in the drawing of the contract.

It is very evident that such contracts were not sales of

these bonds *at not less than par*, according to the intent and meaning of the statutes of Illinois, under which the officers of the state were authorized to contract for the loan. For if the officers could issue bonds which would draw interest immediately, and still be allowed to give the purchaser of such bonds the use of the money loaned for ten months, without interest, they could with the same propriety, so far as the statutory prohibition was concerned, have sold the bonds upon a contract that they should be delivered and draw interest immediately, and that the purchaser might advance the nominal amount of the bonds in instalments of from one to five years; as the same might be wanted by the complainant to carry on her public works.

The defendant endeavors to avoid this difficulty by his affidavit that the rate of exchange, between New-York and Illinois, at the time of making these contracts, was five per cent in favor of the former place. He infers, from that circumstance, that the funds in New-York would be worth five per cent premium to the state. And therefore, that the bonds were not sold under their par value; as that would be equal to the interest on the bonds, for the ten months, at six per cent per annum. I presume he speaks, in his affidavit, of the rate of exchange at the city of New-York; and not that the state could sell the drafts in Illinois at five per cent premium, in gold or silver, or its equivalent. And he certainly had no right to presume the legislature intended to authorize its officers or agents to turn brokers; and to buy up the bills of the Illinois banks, in the city of New-York, or drafts upon the banks, or upon individuals, for the purpose of reimbursing the state for the loss of interest. Besides, the difference of exchange in the city of New-York, in favor of that place, would not necessarily be the same in Illinois; where the state would have to sell its drafts to obtain the money and realize the difference in exchange.

If I correctly understand the word exchange, it includes an allowance for the time necessary to collect the draft and to obtain a return of the avails thereof, as well as the

expense and risk of transmitting the specie or its equivalent; where the draft is drawn at the place in favor of which the balance of trade is found to be. It necessarily follows from this, that the difference of exchange in favor of New-York, at that place, would be greater than in the state of Illinois where these drafts were to be drawn. For a broker in the city of New-York, in purchasing a draft on Illinois, or the bills of its local banks, in addition to his charge for the expense and risk of obtaining the specie or its equivalent from that state and bringing it to New-York, would have to add something for the loss of interest, from the time when he advanced the money in New-York until he could reimburse himself at that place out of the proceeds of his draft, or of his local bank notes; whereas a purchaser, in the state of Illinois, of a draft on New-York, in favor of which latter place there was a balance of trade, would only pay a premium equal to the expense and risk of transmitting the specie, or its equivalent, to New-York, where the funds were wanted by him ; with a trifling addition, if he wished to send the draft by mail, for the more rapid transmission of a draft than of gold or silver. The affidavit of the defendant, therefore, is not sufficient to show that if the difference in exchange between the two places had continued the same, at the time these several instalments fell due, as it was at the making of the contract, the drafts could have been sold in Illinois for a premium which would have been equivalent to the interest on the bonds for the ten months allowed to the defendant by the last contract.

But I cannot concur in the opinion, so confidently expressed by the counsel for the defendant, that the difference in exchange between New-York and Illinois must be taken into consideration, in determining the question whether the bonds were sold at their par value. The very idea of a sale of a bond, or draft, or other security for the payment of money, *at par*, is that it is to be sold dollar for dollar of the amount due and payable thereon ; without any allowance for the expense or risk of collection, or for the time

necessary to transmit the funds from one place to another. Such is the popular or generally received meaning of the terms *par*, or *par value;* and this was unquestionably the sense in which these terms were used by the legislature of Illinois, in the statute under which the officers of the state were authorized to issue these bonds, or certificates, as securities for the loans made by them in behalf of the state. Should a merchant in New-York agree to sell goods to his customers, and to take his pay in a draft on Philadelphia at par, or in the bills of the Philadelphia banks at their par value, neither would ever think of deducting from three to five per cent, from the face of the draft or bills, on the ground that the difference in exchange was at that rate in favor of New-York. It is evident, from these statutes, that the legislature of Illinois contemplated a sale of the stocks, which they authorized to be issued, in the eastern commercial cities, and of some of them in Europe. The officers of the state were for that reason authorized, by some of the laws, to make the interest as well as the principal of the bonds payable at such place either within or without the United States, and in such currency, as might be agreed on. They were even empowered to execute the bonds in foreign languages. Still the legislature were careful to restrict their agents, in all of these cases, so that they should in no event be authorized to sell the stock of the state at less than par value. I am perfectly satisfied, therefore, that the officers of the state were not authorized to sell the bonds at a discount, by reason of any difference in the actual rate of exchange between the place where the sales were made, and where the bonds themselves were made payable, and the state of Illinois. The legislature correctly supposed, that if the principal and interest of the bonds should be made payable where the money was loaned, the lenders could not reasonably claim a premium upon such loans on account of any difference in exchange. For if the rate of exchange should be in favor of the place where the loan was made at the time of issuing the bonds, the legislature had provided an equivalent for that difference, by

allowing the principal and interest of the bonds to be made payable at the same place.

1840.

The State of
Illinois
v.
Delafield.

I agree, however, with the distinguished counsel for the complainant who last addressed the court, that upon the sale of the bonds in foreign countries, the legislature contemplated a sale at the actual par, and not the mere nominal par, between the United States and such foreign countries. It is well known to commercial men, that the nominal difference of exchange between this country and England is much greater than the real difference: that while the nominal par value of a pound sterling is but four dollars and forty-four cents and a fraction of a cent, its real value is rising of nine per cent more; not seven and a quarter per cent, as the counsel erroneously supposed. This difference arises partly from a change in the comparative value of gold and silver bullion since the time when a Spanish milled dollar, or eight shillings of the currency of the colony of New-York, was equal to four shillings and six pence sterling money of England; and partly from the actual difference in the value of gold in the United States and in England, especially since the act of congress of 1834. The British sovereign is equal to a pound sterling in England; and is by law receivable and payable at that rate in all commercial transactions, in that country. That of course regulates the value of gold bullion there. But, by our laws, the English sovereign is equal in value to $4,85, or about that sum, in payment of debts here; and other British gold coins bear the same relative value to the gold and silver coins of the United States. Exchange on England is therefore actually at par, when a bill at sight can be purchased at the rate of $4,85 to the pound sterling; although such bill is then nominally purchased at about nine and a quarter per cent pemium. As the nominal difference in exchange between this country and England has not averaged more than from eight to ten per cent in favor of the latter for several years, it will be seen, from this view of the subject, that the real difference in exchange has been little or nothing during that

time. There is, therefore, no absurdity in supposing that the legislature of Illinois contemplated the probability that the sterling bonds of the state could be sold for their actual par value in London; especially those in which the interest as well as the principal was made payable there, such interest being one per cent above the legal rate of interest in England.

I think also the counsel for the complainant are right in supposing that these state officers and agents were not authorized to contract for a sale of these bonds on a credit. As a general rule an agent for sale, unless he has an express authority to sell on a credit, must sell for cash. An authority to sell on credit is implied, however, where from the general usages of the trade in which the agent is employed it is the custom to sell on credit. But if the property, which the agent is employed to sell, is of a description which is usually sold for ready money only, he is not authorized to sell it on credit without an express authority to do so. (*Smith's Merc. Law*, 2d *Lond. ed.* 87.) In the case of *Wiltshire* v. *Sims*, (1 *Camp. Rep.* 258,) where a broker employed to sell stock, without any special instruction to sell it on credit, had sold it upon a credit of fourteen days, Lo d Ellenborough held that the agent was not authorized to sell on a credit; and that the owner of the stock, therefore, was not bound by the contract. This case is referred to with approbation by Mr. Justice Story, in his very learned and valuable commentaries on the Law of Agency. (*Story on Agency*, 74, § 78.) In that case his Lordship inquires, " did any one ever hear of stock being absolutely exchanged for a bill at fourteen days ?"

Here we have no evidence as to any general usage in this state for the sale and absolute delivery of stocks on a credit, by brokers empowered to sell. But I believe, in fact, that they do not usually sell and actually deliver stocks without receiving payment therefor at the time; unless they are specially authorize l by the owner of such stocks to sell on a credit. Even if the usage was otherwise, however, as to sale of stocks belonging to individ-

uals, that would not authorize the officers or agents of a state, who were empowered to borrow money for its use, to contract to sell and deliver the public securities on credit, without an express authority for that purpose. The two or three recent instances, in which states have had the misfortune to lose large amounts of their stocks in consequence of the mistakes of their agents, in suffering such stock to go out of their hands before they received the money agreed to be loaned, cannot amount to a general usage to sell state stocks on a credit.

Indeed, the very idea of selling these state bonds on a credit is entirely inconsistent with the spirit of the statutes of Illinois, under which these bonds were to be issued. The state securities, in the hands of its agents, were not an article of merchandize. The object was to borrow money; not to sell stock in the ordinary way in which stock held by individuals is sold. The statute does, indeed, authorize the agents of the state to contract for loans payable by instalments, as the money may be wanted for the use of the state. But this provision does not imply that the lenders are to receive the securities of the borrower before the money agreed to be loaned is actually lent. I am not aware that any sane and solvent man ever borrowed money by giving his negotiable securities in advance to the lender, and taking in payment therefor such lender's promises instead of cash ; unless the promises were put in such a form as to be convertible immediately into cash, at some rate, and were intended to be sold at a discount to raise money elsewhere. In this case, however, the agents of the state contracted to deliver the securities of their government in advance, and to take a mere agreement, which was not negotiable, to pay the money to the state by instalments, at future times. This was not a borrowing of money ; but it was a sale of the state securities on credit, as an article of merchandize, without any authority, express or implied, to give such credit. The necessary result of such a transaction must be that if there is any great fall in the price of the stock, before the time for the actual payment of the

money arrives, the lender will be unable or unwilling to fulfil his agreement, and the state will lose its securities. Upon this ground, therefore, as well as upon the ground that the sales of the stocks were below the par value, the agreements with the defendant were wholly unauthorized, and were not binding on the complainant.

It is said, however, that the state of Illinois has confirmed the acts of the agents who made these sales ; and that it is now too late to rescind the agreements as having been made without authority. But no officer or agent of the state had any power to make or to authorize the making of such contracts orginally ; and of course none of them had the power to confirm them afterwards. For no person can confirm an unauthorized agreement, made by another, unless he had himself the power to authorize the making of such an agreement. As the sovereign power of the state, by a legislative act, had prohibited any of its officers or agents from selling its stocks below their par value, it follows, of course, that nothing short of a law of the state, proceeding from the same authority, can legalize such a transaction.

I admit that the general ficancial agents of a state may sometimes interpose their powers to protect its interests, where they are endangered by the unathorized acts of others. And probably in this case, those agents might have made an arrangement with this defendant for. a return of the securities which he had not sold, and for a compromise of the claim against him for the others, to prevent an entire loss of this stock ; which arrangement a court of justice might consider as binding upon the state. But if they had any power to make a settlement of the claims of the state against the defendant, for the stocks received by him under these unauthorized contracts, it must be to make an agreement in the nature of an accord and satisfaction of such claim ; and not by way of affirmance of the original unauthorized contracts. Whether any such power existed it cannot be necessary now to determine ; for there is no grounds for a pretence, in this case, that there has been any

accord or satisfaction. The defendant has received and retains the bonds of the state to the amount of $583,000, and has paid for them but $170,000. The balance he has neither paid nor agreed to pay, except by the original contracts which he now refuses to fulfil.

The fact that one branch of the legislature temporarily concurred in the report of its committee that these contracts were unauthorized, could not have the effect of injuring him, by depreciating stocks which he had previously sold. And if he did not wish to sustain a loss upon those which still remained on hand, his proper course was to offer to return them to the agents of the state ; instead of selling them afterwards at a loss, and thereby compelling the state to pay to others the whole nominal amount of the bonds which he had obtained from its agents without authority. If the bonds had been sent by him to England to be sold, as suggested by his counsel, he should at least have offered to return them as soon as they could be sent for and received back from that country.

The contract for the delivery of the bonds being wholly unauthorized, and there having been no subsequent ratification by the legislative power of the state of Illinois, or by any officer or agent who had the power to ratify these illegal sales of the stocks, an injunction must be granted as prayed for. And it must also be referred to a master in the city of New-York to appoint a receiver, and to take from him the requisite security ; unless the complainant should prefer to have the New-York Life Insurance and Trust Company appointed such receiver, in which case no security is to be required. The defendant must also assign and deliver over to the receiver, on oath, under the direction of the master, such of the stocks or bonds, if any, as are now in his possession, or under his power or control ; and the proceeds of such stocks or bonds as have been sold, pledged, or hypothecated by him, and all contracts, securities, and other property taken therefor.

The receiver is to have the usual powers for the conversion of the securities, and the proceeds of such sales, into

money, and to deposit such moneys in the trust company, to accumulate, as often as the sum of $1000 shall be received beyond the necessary expense of the trust. The Illinois bonds, if any, are not to be sold by the receiver, but are to be deposited in the trust company for safe keeping, to abide the further order of this court.(a)

---

(a) Affirmed by the court for the correction of errors, December, 1841.