Lott, J.
It is insisted that the act, under which the bonds' in question purport to have been issued, is unconstitutional and void, because it contained the provision that the supervisor and commissioners appointed therefor should have no power to do any of the acts authorized by it, unless the written assent of two-thirds of,the taxpayers referred to therein had been obtained. This ground is untenable. The act took effect immediately on its passage. It conferred certain powers and rights on the several towns in the county of Cayuga which they did not previously possess, and' which any such town could-avail itself of, at its own election. That election was to be determined by the will of a certain class and number of resident persons taxed in such town, to be expressed by their, written assent. Towns are sometimes called quasi corporations, and by the general law of the State prescribing the powers, duties and privileges of towns, chapter 11 of part 1 of the Revised Statutes (1 R. S., p. 337, § 1), “each town, as a,body corporate, has capacity ” to do certain acts and exercise certain prescribed powers;, and it is declared that “no town shall possess or exercise any corporate powers, except such as are enumerated in this chapter, or shall be specially given by law, or shall be necessary to the exercise of the powers so enumerated or given.” (§ 2.)
*447 The power to boixow money and to subscribe for railroad stock was not one of the general powers possessed by towns, and the object of the act in question was to give it, upon certain terms and conditions prescribed! It was, in other words, a qualified and limited power; the same in principle as is conferred on a corporation to be exercised by and with the assent of its stockholders, or a portion of them, or upon an individual, with the previous approval of ah officer of the court. It was not like the free school act, declared by this court to be unconstitutional ixi Barto v. Himrod (4 Seld., 483). The legislature, instead of declaring that to be a law, submitted it to the people of the whole State to determine, by a majority of the votes cast, whether it should or should not become a law. It was said by Ruggles, Ch. J., in his opinion in-that case, “In substance and reality the legislature propose the law. The people pass or reject it by a general vote. This is legislation by the people ” (p. 488). He says further, after referring to the provisions vesting the legislative power in this State in the senate and assembly, that “ the legislature had no power to make such submission” (p. 489), and Willard, J., in the same case, after taking substantially the same view of the question, says that “ it is not denied that a law may be passed to take effect on the happening of a future event ” (p. 495), and, after citing several examples, he adds, “ The future event. gives no additional efficacy to the law, but furnishes the. occasion for the exercise of the power." "x" * “ The law is complete when it has been passed through the forms prescribed by the Constitution, though its influence may not be felt until a subject has arisen upon which it can act” (p. 496).
In the case under consideration, the act, as before stated, by its terms took effect immediately; but parties to be affected by it were at liberty to accept the privileges granted, and. incur' the burdens and obligations it would impose as their interest or will should dictate:. and any one or more of the towns, referred to therein, could take the benefit of it, and make it effective as to themselves, irrespective of the election or will of the others. It was therefore in all its material characteristics *448 entirely different from the school law; and the principle on which that law was held to be unconstitutional, has no application to this.
A law, having the same general object in view as the act we are examining, was passed about a year after it (Laws of 1853, chap. 283), by which the village of Rome was authorized to subscribe for and take and hold stock in a railroad and provide for the payment of it by issuing corporation bonds; but it was declared therein that “ the board of trustees should have no power to make such subscription as is authorized in the first section of this apt, nor to issue bonds or create any liability under this act, until it has been previously approved by two-thirds of all electors who shall have paid a tax on personal or real estate in said village, whose names shall appear regularly on the last village assessment-roll for the year next preceding the one in which the vote was takenand provision was made for determining the fact of such approval at a special election to be held for the purpose.
The constitutionality of that law was called in question in the case of The Bank of Rome v. The Village of Rome (18 N. Y., 89). One of the grounds taken against its validity was, that it delegated the legislative power of this State to the voters of the village of Rome within the principles settled in Barto v. Himrod (supra). The provision above cited required the act itself to be approved by the electors before the power conferred by it could be exercised, and in that respect was distinguishable from the law under consideration, and more obnoxious to the objection suggested and urged against it; but this court held it to be constitutional and valid. Johnson, J., in giving the opinion of the court, concluded it by saying that the case was, in substance, only “ a submission, to a vote of the parties interested, of the question whether or not they chose that the municipal corporation should subscribe to the railroad. In other words, the legislature did not compel the village to subscribe, but, creating by law the necessary machinery, left it to the taxpayers to determine the matter.”
*449 The principle decided in that case, and the considerations above suggested, lead us to the conclusion that the law in question is valid.
2d. The next, and an important, question presented is, whether it was incumbent on the, plaintiff to show affirmatively that the assent of the taxpayers, required to be obtained by the said act, had in fact been obtained.
The towns of this State, as before remarked, have not the general power to borrow money, nor are their officers, in the exercise of their ordinary duties, authorized to issue bonds or any other evidence of indebtedness, in the name of the towns represented by them, for loans or other debts contracted or incurred on their behalf. Such power must therefore be specially conferred by a grant from the legislature; and there is no doubt that the grant may be made, upon such terms and under such limitations, restrictions and conditions as may be deemed' necessary and proper for the protection of the taxpayers who are to pay the debt, on the one hand, and for the security of the lenders and creditors, on the other. The power may, therefore, be either general or qualified or special: That conferred in this case was of the latter character. The act expressly declares that the officers vested with the authority of borrowing the money on the faith and credit of their town, and performing the other acts therein specified, should “have no power to do any of 'the acts” authorized by the law until a railroad company had been organized for the purpose of constructing the railroad designated therein, and such written assent had been obtained, and, together with an affidavit of the character specified in the first section of the act, had been filed as is directed by that section. The legislature have thus seen fit to declare, in addition to other requirements and conditions imposed by the law, that taxpayers of the towns included within its operation should not be charged with the burden of the debt contemplated, except with the- written assent of two-thirds of the resident persons taxed in said towns appearing on the assessment-roll thereof made next previous to the time such money was borrowed. Such assent was to be obtained by *450 the officers designated, or some or one of them, and filed in the office of the clerk of Cayuga county; and those officers had no power to borrow such money, nor do any of the other acts authorized, until such assent was so obtained and -filed. That is an absolute prerequisite and a condition precedent. The requirement is clear and specific in its provisions; and the act affords a certain and unmistakable means of .ascertaining whether it has been complied with. It refers to and adopts the assessment-roll of the town made next previous to the time when the money was to be borrowed, as the means of determining by whom the assent is to be given, and whether the requisite number of them has been obtained.
Evidence of such assent was therefore necessary as the basis and foundation of the right to contract the debt and execute the bonds in quéstion. Such evidence was not given. It is expressly stated in the Case, aS before remarked, that al though some of the signatures to the assents produced were genuine, the plaintiff “failed to prove that said signatures constituted or were the signatures of two-thirds of the resident persons taxed as appeared on any assessment-roll of said town whatever,” but he appears to have relied on the affidavit, to which they were annexed, as sufficient evidence of that fact. The court below apparently have assented to that proposition, and its ruling and decision were evidently based on that view of the case. This, in our opinion, was an erroneous construction of the act. It requires, as one of the conditions of the grant of the power conferred, that an affidavit “to the effect that the persons, whose written assents are thereto attached and filed as' aforesaid, comprise two-thirds of all the resident taxpayers of said town on its assessment-roll next previous thereto,” should be filed with such assent; but it does not state or declare—certainly not in terms—that such affidavit shall be the evidence of the requisite assent, nor' that it shall operate as a protection to the lender; nor is there anything in the act from which it can be fairly inferred that such was its object. The material and controlling requirement was the assent in fact of the taxpayers, expressed in writing, signed *451 by them. • The ordinary proof, to establish that, was the evidence of a witness to the signature, or of some- person acquainted with it and able to express a belief that it was genuine; but it was competent for the legislature to provide that an affidavit or any other proof should be sufficient. That -has not been done in the case before us. It is important here to observe, that the affidavit necessary to be filed is required to be made by the supervisor or commissioners, or any two of them, charged with the duty of obtaining the requisite assents, while it is provided that such assent might be obtained by some one or more of them. It may be (and as it appears there were three several papers, purporting to be such assents, it probably •was the fact) that the signatures, or most of them, were procured through the separate agency of those officers, but it is ■not reasonable to assume that all were so procured by the supervisor. The person who did act and perform the duty would be able to prove the actual subscription of the signature, and it is not at all probable that the others, or either of them, were sufficiently acquainted with the handwriting to ■prove its genuineness. It was, however, competent for all of them, after an examination of the proper assessment-roll, to swear that the persons, whose names purported to be subscribed to those assents, comprised two-thirds of all the resident taxpayers on- it, and that, in my opinión, was all that was intended to be proved by that affidavit. This construction is reasonable and consistent with the general design and intention of the act. Such an affidavit would relate to a matter merely of computation, and when the verity of it was to be established by the oath of two individuals, reasonable proof, in that respect, was secured; but the fact of such assent was to be ascertained and proved like any other fact, of which the evidence was manifested in writing. The affidavit in question does not, in terms, state, and I do not think the statement therein made, “that the several persons whose written assents are hereto attached ” can be construed to mean, that those persons subscribed such assents. It was sworn to by four different individuals, and it is not, in-my opinion, to be credited that all *452 and each of them could swear to the genuineness of the signature ; but on the contrary, the fair construction of their language is, that they only meant to say that those persons constituted two-thirds of the residents of their town who were taxed on the assessment-roll referred to. It may be added, that the ordinary proof of the execution of a written instrument, authorized to dispense with oral testimony, is the certificate of an officer appointed to take such proof, and there is nothing to warrant us in the conclusion that it was the intention of the legislature, after providing all the safeguards it has, against the creation of a debt, unless assented to by the town, that the mere filing of a paper, purporting to be evidence of the consent required by the law, without an affidavit, at least clearly showing that it was genuine and actually signed by the persons whose names appear as subscribers, should be sufficient proof to establish the important fact of such assent.
These views lead us to the conclusion that it was incumbent on the plaintiff to prove that the written assents given in evidence had actually been signed by the requisite number of taxpayers designated in the act, and that the omission to provide such proof is fatal to the recovery. In coming to this conclusion, I have not overlooked, nor failed to give full effect to, the decision of this Court in the case of The Bank of Rome v. The Village of Rome (19 N. Y., 20). The provision of the statute under which that case was decided, and which has already been referred to in considering the constitutional question above discussed, is materially different from the law under consideration. That act, after conferring the power on the village to subscribe for railroad stock and to issue bonds for the payment thereof, on obtaining an approval of the said act itself by two-thirds of the electors required by the eighth section above cited, which was to be ascertained at a special election to be held and conducted at the time and in the manner directed in the ninth section, provides in that and the tenth section, that the trustees of the village, after the canvass directed to be made at such election, “ shall immediately thereafter return to the clerk of the board of trustees the *453 aggregate number of votes taken, designating how many were for and how many against taking railroad stock ” (§ 9), and that “ the president and trustees shall, within two days after the return of said trustees to the clerk, meet and proceed to canvass the votes thus certified and returned, and shall make out and file in the office of the clerk of Oneida county the .certificate setting forth that this act is approved or not approved, as the case may be; and if it shall appear from such certificate that this act has been approved and the issue of stock authorized, the president and trustees of said village shall proceed to make subscription and to issue bonds as authorized by • this act.” (§ 10.) It will be seen from these provisions of that act above referred to, that the power to subscribe for the stock and issue the bonds, was to become operative and effectual on the approval of the act by the electors-of the village; and that the certificate of such approval, duly filed in the office of the clerk of the county of Oneida, was declared to be evidence of that fact and fully authorized such subscription and the issue ' of bonds therefor. Those. bonds were directed to be placed under the entire control and management of five individuals called “ Commissioners of the Railroad Fund of Rome,” who were vested with the power of “ entire control and negotiation of said bonds ” upon certain terms and restrictions; and it was conceded in that case that the bonds had been legally issued to such commissioners, and the question there discussed and decided arose upon their disposition thereof. The decision made therein therefore does not conflict with the views above expressed, but is entirely consistent therewith.
3d. As the requisite assent to borrow money and do the other ' acts authorized by the law in question may be shown on a new trial, it may be proper to consider and determine now, whether (conceding such assent to have been given) the power has in fact been executed so as to create a liability on the part of the defendant. The power conferred was limited to the perform anee of certain acts, and was to be executed by the supervisor and the assessors of the town. The object was to extend aid-towards the construction of a railroad or railroads running *454 through the city of Auburn, connecting Lake Ontario with the Susquehanna and Oayuga Railroad or the New York and Brie Railroad. That aid was to be afforded by the payment to a railroad company organized for that purpose, of such a sum of money as those officers might deem necessary, not to exceed twenty-five thousand dollars to be borrowed on the faith and credit of the. town, or raised by tax therein, at the election of the taxpayers, to be expressed in and by their written assent before-mentioned; and for the amount so' paid an equivalent amount of stock was authorized to be subscribed and taken in the name of their town. If the money was borrowed, the supervisor and assessors were authorized “to execute therefor, under their official signatures, a bond or bonds,” to be made payable with interest on such terms as might be agreed upon and expressed in the bonds.. The money so borrowed was directed to be paid over to the president and directors of such railroad company as might be designated in that assent, to be expended by them in grading, constructing and maintaining such railroad or railroads. The bonds were authorized to be issued for money actually borrowed and for no other purpose or consideration, but they were in fact delivered to the railroad company for stock to an equal amount in value, with the object, as is evident from the agreement made at the time "of such delivery, that they should be sold in the market for the purpose of raising money on them in that manner. This was not an execution of the power and authority granted, but an appropriation of them in a manner not contemplated by the legislature nor by the assent given.
It was evidently the intention of the act that money should be raised and paid over to aid in the construction of a railroad, and no color is given to the idea or the position that the credit merely of any town should be given, through and by which money might be raised. A town might be willing to incur a debt to a limited sum, with the knowledge that the whole amount for which it was incurred was actually to be appropriated to the construction of a railroad that might be deemed conducive to its interests, but would absolutely refuse tó issue *455 their bonds, for the purpose of sale, from, which much less than the amount for which they were given might be realized. If it had been intended to authorize bonds to be given for stock, there is no reason why that intention should not have been declared, as was done in the law in relation to the village of Rome above referred to. The statute, under any aspect of it, confers extraordinary powers, by which heavy burdens, for the term of twenty years, may be imposed on one-third of the taxable inhabitants against their will for an enterprise which they may deem injudicious and inexpedient; and indeed actually prejudicial to the welfare of their town. It therefore should receive such construction as its language and terms clearly call for; and the powers granted should not be extended by implication, or on the idea that the same end may be attained in a different manner. There is no ambiguity in the language of the act by which the power in question is granted, and it is unquestionable that the bonds issued were not given for money borrowed, the purpose for which, and for which only, they could be used. They were therefore clearly issued without authority and as the railroad company received them on a consideration not authorized, it was chargeable with a knowledge of their invalidity, and they never could have enforced them. The plaintiff stands in no different or better position. He purchased those on which this action is brought directly from the company, with full notice of the facts and circumstances under which they had been received. He is therefore not a-bona fide holder of them, and the rights of the parties are to be determined in the same manner and on the same principles as if the company was seeking to" collect them.
These considerations lead us to the conclusion that the defendants are not liable to the plaintiff on these bonds, and that the judgment of the court below is consequently erroneous and must be reversed and a new trial ordered.
*456 The following opinion was delivered in the ease of Gould v. The Town of Sterling:
Selden, J.
The first objection made to the recovery in this case is, that the act of 1851 authorizing the town of Sterling to borrow money is in conflict with the Constitution, upon the principles established in Barto v. Himrod (4 Seld., 483). This objection is sufficiently answered by the case of The Bank of Rome v. The Village of Rome (18 N. Y., 38). Previous to the act of 1851, the town of Sterling had no power to borrow money or subscribe for stock, even if every inhabitant of the town were desirous of doing so. It was under a disability which it required legislation to remove. The effect of the statute was simply to remove this disability. Whether it was expedient for the town to exercise the power when obtained, was another question. It belonged to the legislature to confer the power, and this it did, without requiring the consent of the town. It belonged to the town to act under the power, and this was left to the town, without any interference on the part of the legislature, except to prescribe by what majority and in what mode it should act. There was here no submission of any legislative question to the town. All that it was essential for the legislature to do was done finally and absolutely. It was not submitted to the people of the town in any form, whether the act, or any portion of it, should take effect. All that was submitted to them was the prudential question, whether it was expedient to avail themselves of the power which the statute conferred. It was upon this distinction solely, that I based my assent to the judgment in the case of The Bank of Rome v. The Village of Rome (18 N. Y., 38), and not at all upon the idea that the question was submitted to the people of a village, merely instead of the whole state.
Our next inquiry .isj whether the authority conferred by the statute has been properly exercised. The first section of the act of 1851 authorizes the then supervisor of the town, together with Robert Hume and William Wyman, who are appointed commissioners for the purpose of carrying- the act *457 into effect, to borrow upon the credit of the town a sum not exceeding $25,000, at a rate of interest not exceeding seven per cent, and to execute bonds “ under their official signatures ” therefor, upon which the interest should be “ made payable on the first day of March in each year, and for three successive years after the first day of March, 1852.”
Section four made it the duty of the board of supervisors of the county, in each of the years, 1851 and three following years, to levy and collect from the taxable inhabitants and property of the town, a sum equal to the interest upon the bonds; and in each of the years succeeding the said three years, to levy and collect in like manner, a sum over and above the interest, equal to the principal which would fall due, on or before the 1st of March thereafter. The bonds or obligations in question were not in fact issued until August, 1853, and were signed not by John M. McFadden, the supervisor of the town of Sterling for the year 1851, and by Robert Hume and William Wyman the commissioners named in the act, but by William Wasson,'supervisor for the year 1853, and by Robert Hume and Isaac Turner, the commissioners elected for that year under section 10 of the act.
It is insisted by the defendant’s counsel that the authority to act was given specifically to the supervisor for the year 1851, and to the commissioners named in the act, and that no' other persons could exercise it: also that the persons whose assent was to be obtained, were those appearing upon the last assessment roll previous to the passing of the act; and that the power to levy and collect the sums necessary to pay the principal and interest of the bonds was confined to specific years, and could not be exercised at any other time.
There is no doubt that a statutory power of this kind must be strictly pursued; and were there no other authority for the issuing of the bonds in question, than the act of 1851, they would, in my opinion, be clearly void. An additional act, however, was passed in 1853 (Sess. Laws of 1853, ch. 605), by which it was provided; that it should be “lawful for the supervisor and railroad commissioners of the town of Sterling, *458 to execute the bonds authorized to be issued ” by the act of 1851, “ with provisions and stipulations therein, for the payment of the interest to accrue upon the said bonds, on the 1st day of January and July in each year instead of the 1st day of March,” as was provided by the previous act.
This last act was very imperfectly framed. It substitutes, with sufficient clearness, the supervisor and commissioners for the year 1853, for those of 1851; but it leaves all the other specific provisions of sections 1 and 4 of the act of 1851 without modification in terms. Still, by a liberal construction, in view of the obvious design of the act, it may with propriety be held, that the effect of the act of 1853, was to modify the entire act of 1851, so that its'provisions should have the same application to the bonds authorized by the act of 1853, as to those authorized by the previous act; in other worus that the year 1853, was to be substituted in all respects for the year 1851, in the original act, and the other provisions to be modified in accordance with this change. This construction removes the principal if not all the difficulties' growing out of the departures from the strict letter of the act of 1851. It is said that the bonds purport upon their face to be issued by virtue of the act of 1851 alone; and hence that they cannot be sustained by a resort to the provisions of the subsequent act. ■ This, however, is an erroneous conclusion. There was no necessity that the bonds should, in terms, refer to either act. The irm portant question is, whether the authority existed; not whether it is properly stated in the bonds.
But there are other objections to the validity of these bonds of a more serious nature. The statute authorized the officers of the town to borrow the sum of $25,000, and pay it over to the president and directors of the railroad company to be expended by them “ in grading and constructing ” a railroad, &c. Instead of borrowing the money, the supervisor and commissioners delivered over the bonds to the company in payment for stock, for which they were authorized by the act to subscribe, and the company sold them at a discount. The question is, whether this was within the authority conferred by the *459 act. It is clearly not within its language. Ho money was borrowed, and nothing else was authorized by the terms of the act. If however what was done, was the same in effect, as if the money had been borrowed, and paid over to the railroad company, the difference in form would not be material. But it is plain that neither in respect to the railroad company nor the town was its effect the same. If the statute had been pursued, the company would have had a sum equal to the par value of the bonds, to expend upon their road. As it was, they were compelled to sell the bonds at a discount, in order to realize the money.
If they could sell at a discount at all, they could of course sell at any sacrifice however great. The bonds of the town of Sterling for $25,000, might have been sold for $10,000. Can it be supposed, that if such a power had been specifically asked of the legislature, the request would have been granted ? Would the town have been permitted to raise by taxation upon its inhabitants $25,000, for the sake of furnishing the railroad company with $10,000, to be expended upon its works? I think not; and yet this is, in effect, the power which it is claimed was conferred by the act authorizing the town to borrow. The rate of discount, whether more or less, can make no difference with the principle.
Had the town itself made the sale, and paid over the avails to the railroad company, it seems to me entirely clear, that the transaction would have been illegal. It is usual for the legislature when conferring upon a municipal or other corporate body the power to raise money upon the faith and credit of the corporation, to guard against such a, sacrifice. An example of this may be seen by referring to the act amending the charter of the city of Rochester, passed July 3, 1851. By section 12 of that act the common council were authorized to create a public stock not exceeding $30,000, to be applied to the erection of a city hall; and for that purpose to issue bonds or certificates in the usual form. They were also authorized to sell and dispose of such bonds or certificates “ upon such terms as they should (shall) deem most advantageous to *460 the city, but not for less than par" By section 285 of the amendatory act, power was conferred upon the common council to borrow upon the faith and credit of the city a sum not exceeding $300,000, at a rate of interest not exceeding seven per cent, and to issue bonds therefor; and by section 286, they were authorized to sell and dispose of such bonds, upon such terms as they might deem most advantageous, and to invest the proceeds in the Genesee Valley Railroad Company; but they were expressly prohibited from selling them for less than par.
The reason why such a prohibition was not inserted in the act under consideration can be readily seen. By each of the sections of the act amending the charter of the city of Rochester, to which I have referred, the common council were expressly authorized to sell the bonds; and hence the necessity of the restriction. In the present case, the only authority given. by the act is to borrow upon the bonds of the town. Ho express power to sell the bonds is given, and no such power can, I think, be implied. To borrow money and give a bond or obligation for it, and to sell a bond or obligation for money, are by no means identical transactions. In the one case the money and the bond would, of course, be equal in amount: in the other, they might or might not be equal. Hence, a mere authority to a corporation to borrow money upon its bonds is equivalent, ex vi termini, to an authority to dispose of the bonds at par; and no further restriction is necessary.
But, it is true, the town did not itself sell the bonds, nor ■ make any sacrifice upon. them. It transferred them to the railroad company at par, in payment for stock for which it was authorized to subscribe. This, however, does not strengthen the plaintiff’s case. It was as much a departure from the terms of the statute as if the town had itself sold the bonds at a discount, and was equally inconsistent with the object and intent of the act, which was, that the railroad company should receive a sum equal to the amount of the debt incurred by the town, to expend upon the road, in the completion of which the town was supposed to have an interest. There is, therefore, in *461 this case, not only a literal, but a substantial, difference between the course pursued and that pointed out by the statute. It follows that the bonds were illegally issued, and were, consequently, void in the hands of the railroad company; and, as the referee has expressly found that the plaintiff became the purchaser, with full knowledge that the bonds had not been issued for money borrowed, but in payment for the stock of the company, he is in no better situation than the railroad company itself.
There is another objection, which is equally fatal to the validity of the bonds. Section 1 of the act of 1851, after conferring upon the supervisor and railroad commissioners power to issue the bonds, concludes with a proviso to the effect that these officers should have no power to do any of the acts authorized by the statute until “the written assent of two-thirds of the resident persons taxed” in the town, as appearing upon the last assessment-roll, should have been obtained and filed in the clerk’s office of Cayuga county..
Each of the bonds upon which the action was brought stated upon its face that the requisite assent had been obtained and filed, and to each was attached a certificate in the following words: “ Cayuga County Clerk’s Office, ss: I, Edwin B. Morgan, clerk of the County of Cayuga, hereby certify that a paper, purporting to be the written assent of two-thirds of the resident taxpayers of the town of Sterling, with the affidavit required by section 1 of the act referred to by its title in the foregoing bond, has been filed in this office.”
The statute did not authorize the giving of any such certificate, nor did it provide for the filing of any affidavit, or prescribe in any manner the evidence by which the requisite assent should be established. The paper referred to in the certificate was also produced from the files of the clerk’s office, with a number of names attached. This paper, together with the certificate, was read in evidence, under objection by the defendant’s" counsel. No evidence was given, or offered, of the genuineness of the signatures; nor that the subscribers were resident taxpayers of the town of Sterling; nor that the persons whose *462 names were appended, if taxpayers, would constitute two-thirds of the whole number. The defendant’s counsel moved for a nonsuit for want of such ' evidence; and the motion was denied.
It was not contended upon the argument, if the obtaining, of the written assent of two-thirds of the taxpayers, pursuant to the statute, is to be regarded as an indispensable prerequisite to the exercise of the power to issue the bonds, that the evidence was sufficient, under the ordinary rules of evidence, to establish the fact. But it was claimed, on the part of the plaintiff:
1. That the provision in regard to the consent of the taxpayers was not intended as a condition precedent, but merely as directory to the supervisor and commissioners; and that, whenever those officers were satisfied that such consent had been given, they had power 'to act.
2. That the town was estopped by the acts of its agents in executing bonds asserting upon their face that the requisite assent had been obtained and filed, and negotiating these bonds with the certificate of the county clerk annexed; especially after having acquiesced for a considerable time in such acts.
3. That the bonds are negotiable instruments, and that the plaintiff is a bona fide holder without notice of the defect.
The first of these positions is obviously untenable. It is quite impossible to. construe the proviso in the statute as embracing a mere direction to the officers upon whom the authority is conferred. It was plainly intended to make the obtaining of the assent of the taxpayers a condition precedent to the exercise of the power. Its words are, “ Provided always that the said supervisor and commissioners shall have no power to do any of the acts authorized by this act until,” &c. This admits of but one interpretation. It would be impossible to create a condition by language more explicit. The want of proof, therefore, that' this condition had been complied with, must be fatal to the recovery, unless the plaintiff is protected as a bona fide purchaser or can maintain his position that the town is estopped.
*463 The estopp'el contended for is supposed to result from that rule of the law of principal and agent in accordance with which it is held that, where a power is conferred,,if the agent does an act which is apparently within the terms of the power, the principal is bound by the representation of the agent as to the existence of any extrinsic facts essential to the proper exercise of the power, where such facts from their nature rest peculiarly within the knowledge of the agent. This is the doctrine asserted in the case of Farmers' and Mechanics' Bank v. Butchers' and Drovers' Bank (16 N. Y., 125). No representation of the agent as to the fact of his agency, or as to the extent of his power, is of any force to charge the principal. But, it being shown by other evidence that the agency existed, and that the act done was within the general scope of the power, the principal is bound by the representation of the agent as to any essential facts known to the agent, but which the party dealing with him had no certain means of ascertaining.
The reason upon which this rule is founded is that given by Lord Holt, in Hern v. Nichols (1 Salk., 289), viz., that, where one of two innocent parties must suffer through the misconduct of another, it is reasonable that he who has employed the delinquent party, and thus held him out to the world as worthy of confidence, should be the loser. This reason can, of course only apply to a case where the principal has himself employed the agent, and voluntarily conferred upon him power to do thfe act. This clearly is not such a case. The agents here were designated, not by the town, but by the legislature; and no power whatever was conferred by the town,- unless the assent of the taxpayers was obtained. Any representation, therefore, by the supervisor and commissioners in respect to such assent would be a representation as to the very existence of their power. Such representations, as we have seen, are never binding upon the principal. It is obvious, therefore, that the doctrine of the case of The Farmers' and Mechanics' Bank v. The Butchers' and Drovers' Bank has no application to the present case.
*464 It is also inapplicable for another reason. Knowledge of the facts in regard to the assent of the taxpayers was in no manner peculiar to the supervisor and commissioners, but was equally accessible to the parties receiving the bonds. The statute, of which they were bound, of course, to take notice, apprised them that the bonds could not be legally issued until the requisite assent was obtained, and also that the assent, when obtained, would be placed upon the files of the county. The case is not, therefore, at all like that of the Butchers’ and Drovers’ Bank, where the extrinsic fact related to the state of the accounts of the bank with one of its customers, which could only be known to the teller and other officers of the bank. Here the parties who received the bonds had the means of ascertaining, and were bound to inquire as to the existence of, the facts upon which, as they knew, the validity of the bonds depended.
The negotiability of the bonds in no manner aids the plaintiff. It is true they are negotiable, and have in this respect, most if not all the attributes of commercial paper. But one who takes a negotiable promissory note or bill of exchange purporting 'to be made by an agent, is bound to inquire as to the power of the agent. Where the agent is appointed and the power conferred but the right to exercise the -power has been made to depend upon the existence of facts, of which the agent may naturally be supposed to be in an especial manner cognizant, the bona fide holder is protected; because he presumed to have taken the paper, upon the faith of the representation of the agent as to those facts. The mere act of executing the note or bill, amounts of itself in such a case, to a representation by the agent to every person who may take the paper, that the requisite facts exist. But the holder has no such protection, in regard to the existence of the power itself. In that respect the subsequent bona fide holder is in no better situation than the payee, except in so far as the latter would appear of necessity to have had cognizance of facts, which the other cannot be presumed to have known.
*465 There is an obvious distinction between this case and that of the State of Illinois v. Delafield (8 Paige, 527). There the State was the party to be bound, and the State had by law appointed certain officers its agents, and conferred upon them, power to execute and negotiate its bonds. The difficulty consisted in the irregular manner in which the power was executed, not in the creation of the power itself. The distinction is as plain as that between conditions precedent and subsequent in general.
It follows from these principles, that until it was shown, that the written assent of the required number of taxpayers had been obtained pursuant to the act, there could be no recovery upon the bonds. The judgment of the Supreme Court must be reversed, and there must be a new trial, with costs to abide the event.,
Davies, J.,
did not hear the argument in either case; all the other judges concurring,
Judgments reversed, and new trials ordered.